## BATTISE *v.* THE STATE.

1. Upon the trial of a criminal case, a verdict, finding the accused guilty, was regularly returned by the jury and duly received and published in open court. Then, after a short pause, the judge asked the accused and his counsel if they had anything to say why the sentence of the court should not be imposed, to which they replied, "Nothing." The judge then proceeded, in the presence of the jury, which had not left the box, to

pronounce the sentence, and in doing so expressed an opinion as to the guilt of the accused under the evidence. Before the sentence was concluded, counsel for the accused asked and obtained permission to poll the jury. Upon the polling, the fact was discovered that some of the jurors had agreed to the verdict under a misapprehension of the charge of the court as to a material point in the case. The jury were then recharged and sent back to the jury-room to again consider as to their verdict. Subsequently the jury returned a verdict similar to the one first returned. *Held*, that, under the circumstances, the expression of opinion by the trial judge was not cause for a new trial.

2. The alleged newly discovered evidence was not sufficient to require the grant of a new trial.

3. There was ample evidence to support the verdict, and the court did not err in refusing to grant a new trial.

Argued December 18, 1905.—Decided February 19, 1906.

Indictment for murder. Before Judge Cann. Chatham superior court. November 17, 1905.

Ben Battise was convicted of murder, with a recommendation of life imprisonment. He moved for a new trial, on the grounds, that the verdict was contrary to the evidence and to law, etc.; that during the trial the judge, in the presence of the jury, expressed his opinion as to what had been proved; and because of newly discovered evidence of an alibi. The motion was overruled, and he excepted. The alleged newly discovered evidence upon which a new trial was asked was contained in the affidavits of Sam Butler and Robert Lambry. The substance of these affidavits was as follows: On the night of the homicide Butler and Lambry were at the hall, in the little village of Nickerson, in which the deceased, according to the testimony at the trial, was killed. Lambry reached there about seven o'clock that night, and Butler about half past eight o'clock. About half past ten o'clock, or some time between ten and eleven o'clock, they left the hall together, "in order to catch the ebb tide that night to go to Coffee Bluff to cast for shrimp on the low tide early the next morning." When they got to the road, out in front of the hall, they both saw Ben Battise, the accused, as he passed them, going on toward another little settlement called Twin Hill, and they shortly afterwards went on towards Twin Hill themselves, Battise being then about fifty yards ahead of them. When they got about two hundred yards or more from the hall, and while Battise was still within fifty or seventy-five yards ahead of them, and alone, they heard pistol firing back in the direction of

the hall.    They went on home and did not stop or go back to the hall, and Battise soon turned off, in the direction of his home, from the road and disappeared.    Up to the time they left the hall there had been no shooting of any kind.    Each deposed that he was not related to Ben Battise either by blood or marriage, and had only been living at Twin Hill, where Ben Battise lived, a few months, Butler testifying that he had been living there about four months and Lambry that he had been living there three or four months. Butler knew Battise "by sight, having seen him in the river and around Twin Hill after coming there to live."    Lambry "did not know Ben Battise prior to coming to Twin Hill," but got acquainted with him afterwards, and "did not know [him] very well, but knew him by sight and to speak to him."    Neither Butler nor Lambry attended the trial or was subpœnaed in the case.    The first time that Lambry said anything to anybody, except Butler, "about seeing Ben Battise down the road when the shooting occurred was to Henry Battise after the trial of Ben Battise."    And Butler told Henry Battise about it after the trial.    The accused made an affidavit that he did not know of this evidence until after he had filed his motion for a new trial; and his counsel deposed that neither of them knew of it until after the trial.    J. F. Peck made a written statement, not under oath, that Robert Lambry had been employed by him for about a year, and he had found him honest and reliable.    Augustus Oemler made oath that he knew Sam Butler, who had worked for him in his oyster factory for several seasons, and he knew him to be honest, reliable, and trustworthy.    In reply to the affidavits of Butler and Lambry, the State submitted the affidavit of Paul Wright, a brother of the deceased, who deposed: He knew Sam Butler and Robert Lambry, and they were both, at the time of the trial, residents of Twin Hill, which "is a small settlement about a mile from Nickerson, the scene of the homicide; all the residents of Twin Hill are well known to each other and are generally recognized as being very clannish," and are nearly all kin to each other, or related by marriage to each other."    "Robert Lambry was, at the time of the trial of Ben Battise, engaged to marry the first cousin of Ben Battise, and since the said trial he has been married to Battise's relative."    Sam Butler "is also married to some distant relative of Battise."    All "the residents of Twin Hill met and discussed frequently the Battise case and trial, and  .  .  they acted

in concert in raising funds for the defense of Battise," his defense having been "made a community matter." "Deponent knows that subscriptions for the defense of Battise were taken in Twin Hill, and even entertainments given at Twin Hill, the proceeds of which went to the defense of Battise."

The circumstances under which the judge expressed his opinion as to what had been proved are stated by the judge, in his opinion overruling the motion for a new trial, as follows: "The jury having notified the judge, through the bailiff, that they had agreed upon a verdict, were brought into the court-room, the prisoner and his counsel being present. The name of each juror was called by the clerk. The jury were then asked if they had agreed upon a verdict in the case, to which assent was given. The clerk was then directed by the judge to receive and read the verdict. The verdict as written upon the indictment, dated and signed by one of the jurors as foreman, was then read aloud by the clerk in the presence of the court, all the jurors, the defendant and his counsel. It was then noted upon the judge's calendar. There was then a short pause, after which the judge, addressing the defendant and his counsel, asked if they had anything to say why the sentence of the court should not be pronounced, to which they replied, 'Nothing.' The judge then, preparatory to sentence, directed the defendant to stand up, but afterwards, because of his physical condition, permitted him to remain seated, and proceeded to pronounce sentence. It was during this pronouncement that the language complained of was used. The court said to the defendant, in passing sentence: 'The people of your race are given too much to taking human life without stopping to think about the consequences. The evidence shows that this killing was absolutely unnecessary; certainly absolutely unnecessary so far as you are concerned, and it ought to be a lesson to the people of your race out in that section that you are put away for life—confined the balance of your days in the penitentiary—because you did something you had no right to do. You senselessly and causelessly took the life of this man. The sentence of the court is, therefore, that you be taken hence to the common jail of Chatham county by a guard to be detailed by the sheriff; that you be there detained until demanded by a guard from the penitentiary; that you be then taken to the penitentiary edifice of Georgia, and there, or at such other place as the Governor of this

State may from time to time'— Defendant's counsel to court: 'Is it too late to have the jury polled?' The court: 'It is a little out of the ordinary, but the court will permit it to be done.' The first seven jurors, when asked by the clerk the question, 'Is this your verdict?' answered in the affirmative; the eighth juror, when asked said question by the clerk, answered, 'This is my verdict under the charge of the court.' The court said to the juror: 'Is it your verdict based upon the charge of the court and the evidence in the case?' By said juror: 'You charged that if he fired into the crowd he would be guilty.' Defendant's counsel to court: 'I ask that the jury return and reconsider their verdict.' By another juror: 'I understood your charge was that if he shot into the crowd he would be guilty.' . . By another juror: 'I understood you to say that if he shot into the crowd the man was guilty, whether he intended to kill the man or not.' By the court to the jury: 'I charged the jury that the jury must be satisfied, beyond a reasonable doubt, that Battise shot the bullet that killed the deceased before he would be guilty of the offense of murder—applying the rules given the jury.' By the court to the first juror: 'Do you desire to be recharged?' By the juror: 'Yes, sir, on one point.' By the court: 'On what point?' By juror: 'If he fired into the crowd, whether he would be guilty or not. I understood you to charge that if he shot into the crowd he would be guilty.' Court to jury: 'It would not be proper for the court to tell the jury that he was guilty or not guilty of murder. That is a question for the jury to determine under the evidence and the charge of the court.' " After some further explanation upon this point, the court recharged the jury upon the law of murder, and stated to them that before they would be authorized to convict the accused of the offense of murder, they must be satisfied, beyond a reasonable doubt, that he fired the shot which killed the deceased, which instruction was repeated to them more than once, in response to questions asked by jurors. After recharging the jury, the court directed them to return to their room and again consider their verdict. Subsequently the jury returned a verdict similar to the first one.

*Shelby Myrick* and *G. Noble Jones*, for plaintiff in error.

*John C. Hart, attorney-general,* and *W. W. Osborne, solicitor-general,* contra.

FISH, C. J. (After making the foregoing statement of facts.)

1. The Civil Code, §4334, declares that a new trial shall be granted where the judge, during the progress of the case, or in his charge to the jury, expresses or intimates his opinion as to what has or has not been proved, or as to the guilt of the accused. That the judge in the present case, in proceeding to sentence the accused, expressed an opinion that he had taken the life of the deceased, which the accused denied, and that he was guilty, there can be no doubt. Whether the case was legally in progress at the time of the expression of such opinion, and whether the right to poll the jury then existed, are questions we deem it unnecessary to decide, under the view we take of the case. His honor, the trial judge, at the instance of counsel for the accused, recognized that his right to poll the jury still existed, by permitting the poll to be taken, and that the case was not terminated, but was still in progress, by recharging the jury and directing them to return to their room for the purpose of making a verdict. So, dealing with the case as the judge considered it, we have, after mature deliberation, reached the conclusion that the expression of opinion by the judge, under the circumstances, is not cause for a new trial. The reason for our conclusion is, that when the judge inquired of the accused and his counsel if they had aught to say why the sentence of the court should not be pronounced upon the accused in accordance with the verdict, the accused and his counsel replied they had nothing to say. Clearly, we think, by this response, the judge was induced to believe that the right to poll the jury would not be demanded. He was led to believe that the trial had terminated. And the judge, thus misled by the accused and his counsel, was naturally put off his guard and expressed an opinion, when otherwise he would not have done so. The situation which confronted the judge, the parties to the case, and the counsel engaged therein, when the request of the accused that the jury be polled was made, was one for which the accused and his counsel, and not the judge, were responsible. After the first verdict had been received by the clerk of the court from the foreman of the jury and publicly read in open court, and the judge had asked the accused and his counsel if they had anything to say why the sentence of the court should not be imposed upon the prisoner, and they had replied, "Nothing," the judge had the right to assume that all that remained to be done to terminate the case,

so far as that trial was concerned, was to impose the sentence of the law upon the prisoner, in accordance with the verdict of the jury. He had the right, under such circumstances, to regard the connection of the jury with the case as being at an end, and was, therefore, under no duty to the accused to carefully refrain from expressing or intimating an opinion as to the facts disclosed by the evidence or as to the guilt of the accused. If the judge erred, it was because he was mistaken in believing that the connection of the jury with the case was at an end, and for this error the accused and his counsel were responsible; and the accused can not take advantage of an error which was the result of what he himself did.

Notwithstanding the broad and mandatory language of the Civil Code, §4334, there are exceptions to the imperative general rule there laid down. For instance, it has been held not to be a violation of the provisions of that section for the trial judge, upon a motion for a nonsuit, to express his opinion, in the presence of the jury, as to the sufficiency of the evidence to support the action. *Perry* v. *Butt,* 14 *Ga.* 699. So, when "objection is made to evidence offered, the judge has a right, if he deems proper, to give the reasons for his decision on the objections; and such reasons so given, if pertinent to the objections made, do not constitute such an expression of opinion as to violate the code section above cited." *Oliveros* v. *State,* 120 *Ga.* 237, 242, and cit. These decisions were followed in *Central R. Co.* v. *Harper,* ante, 836, where it was held: "In ruling on the motion to dismiss because of the mental incapacity of the plaintiff to sue without a next friend or guardian, the remarks of the judge, assigning his reason for the ruling and the reference of the issue thus raised to the jury, were neither expressions of opinion upon the facts nor upon the credibility of the plaintiff who had testified as a witness." If an expression of opinion by the trial judge as to what has or has not been proved does not require the grant of a new trial under the circumstances in the cases cited, we think it very clear that under the circumstances of the present case the expression by the judge of his opinion as to the guilt of the accused was not cause for a new trial.

2. It seems that the alleged newly discovered evidence was not, perhaps, merely "impeaching, cumulative, or corroborative," as the trial judge considered it; but, in our opinion, it was not sufficient to require or cause the grant of a new trial. The homicide occurred

in a hall in Nickerson. Moses Green, a witness for the accused, testified on the trial: "At half past eight o'clock Battise [the accused] got some ice cream and said he had to go home, get a nap, and catch the tide. He said he was going to leave the entertainment, get a nap, and catch the tide. I think he went home. I judge that from what he told me." In his statement to the jury the accused said: "After a little while Mose Green came by and gave me some cream, and I told him, 'I think I will go home, I am sick to-night, and get a nap, so that I can catch the tide.' So I left there. When I walked out and crossed the bridge near Brown's gate, coming towards there I heard lamentation of men, but I kept on towards home. I did not know anything about the shooting until Estella came home and told me about a lot of shooting down at the hall." Davis Battise, a brother of the accused, testified in his behalf as follows: "I saw him [the accused] in the early part of the night after I first got there [the hall at Nickerson]. At the time of the shooting I did not see him in the hall. I did not get there until eleven o'clock; the shooting took place about twelve." So it seems, from the testimony of Moses Green and the statement of the accused, that the latter left the hall about half past eight o'clock; while, according to the affidavits made by Butler and Lambry, the accused left the hall about half past ten, and according to the testimony of the brother of the accused he was at the hall after eleven o'clock. The accused, in his statement, said he heard no shooting at all; yet Lambry and Butler testify that while they were some two hundred yards away from the hall, they heard firing in that direction, and the accused was then only fifty or seventy-five yards down the road from them. According to the testimony of all the witnesses, there were a number of shots fired at the hall when Ben Wright was killed; and if the accused was within two hundred and fifty or two hundred and seventy-five yards of it, it seems strange that he did not hear it. Moreover Butler and Lambry say, in their affidavits, that they lived at Twin Hill, the same settlement where the accused resided; that they knew him; that he passed them at the road, just in front of the hall, and they recognized him. If this were true, why is it that the accused did not see them? for they say that nobody was in the road except themselves and the accused. If the accused saw them, then he must have known that they knew that he was not at the hall at the time of

the shooting, and could have had them subpœnaed before the trial, for the purpose of proving the alibi by them which they subsequently to the trial testified to, in support of his motion for a new trial. When all of these circumstances are considered in connection with the affidavit of Paul Wright, we do not, as we have said, think the alleged newly discovered evidence was sufficient to require the grant of a new trial.

3. As several witnesses testified that they saw the accused shoot the deceased without provocation, the evidence was amply sufficient to support the verdict rendered.

*Judgment affirmed. All the Justices concur, except Atkinson, J., not presiding.*